IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | | |
|---|---|---|
| RANIER DORAIN MARSH, | ) | |
| | ) | Case No. 1:20-cv-00157-JPC |
| Plaintiff, | ) | |
| | ) | JUDGE J. PHILIP CALABRESE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| ANDREW SAUL, | ) | CARMEN E. HENDERSON |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Defendant, | ) | |

## I.      Introduction

Plaintiff, Ranier Marsh, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c)(3), and Local Rule 72.2(b). The ALJ followed proper procedures and his decision is supported by substantial evidence. Thus, I recommend that the Commissioner's final decision denying Marsh's application for disability insurance benefits and supplemental security income be AFFIRMED.

## II.      Procedural History

Marsh filed for disability insurance benefits and supplemental security income on December 29, 2014. (ECF No. 9 at 121). He alleged a disability period that began on July 12, 2012, for both claims. (ECF No. 9 at 121). The Ohio Division of Disability Determination (the "State Agency") initially denied his claim on October 6, 2016, and denied it again at the reconsideration stage on February 3, 2017. (ECF No. 9 at 121). Marsh then requested a hearing

1

before an ALJ. (ECF No. 9 at 121). ALJ Jeffrey Hartranft presided over Marsh's hearing on October 17, 2018. (ECF No. 9 at 121). Marsh appeared with counsel and testified. (ECF No. 9 at 121, 152-66). John Finch testified via video as an impartial vocational expert. (ECF No. 9 at 121, 166-70). Jeffrey Horwitz, M.D., testified via phone as an impartial medical expert. (ECF No. 9 at 121, 143-52). The ALJ issued his decision on February 12, 2019. (ECF No. 9 at 121-33). He determined that Marsh was not entitled to either disability insurance benefits or supplemental security income. (ECF No. 9 at 121-33)). Marsh asked the Appeals Council to review and set aside the ALJ's ruling, but the Appeals Council denied his request on December 16, 2019. (ECF No. 9 at 5-11). Thus, Marsh's administrative decision was final as of that date. This timely appeal followed. (ECF No. 1).

## III. Background Included in the Administrative Record

As discussed further below, Marsh raises two separate issues here. The first concerns Marsh's peripheral neuropathy in light of the evidence in the record before the ALJ. (ECF No. 11 at 11-14). The second concerns additional evidence (which is detailed below in section IV. below). (ECF No. 11 at 14-17). The ALJ's factual, testimonial, and opinion summaries generally suffice to analyze Marsh's objection concerning his peripheral neuropathy, and the Court supplements below the ALJ's discussion of treatment notes from Kevin Houseman, D.P.M. (The ALJ's summary of Marsh's visual impairments is included here, too, because it is relevant to Marsh's second issue.)

### A. Relevant Hearing Testimony

[Marsh] has significant vision problems, including daily blurriness and fuzziness, and difficulty with peripheral vision. He has problems with depth perception that make it difficult to grab things or see things to his sides. It is difficult for him to make out letters when reading, and he needs to read large print books. He has eye aches and sees floaters when using a computer screen after about 5

minutes. Florescent lighting makes his vision more difficult. He has problems keeping clothes even and straight when folding them. He has poor balance and stumbles a lot. He will trip over things due to his poor vision. He has difficulty going up stairs.  He had to surrender his driver's license in September 2018 due to a lack of peripheral vision, but his wife did nearly all the driving prior to that anyway. He has taken shots to help manage his condition…

(ECF No. 9 at 128).

### B.    Relevant Medical Evidence

#### 1.    The ALJ's Medical-Evidence Summary

With respect to the claimant's alleged visual impairments, the record does support a history of vitrectomy procedures in both eyes in July 2012 (Ex. B1F/2). After that time, the claimant continued to make complaints of decreased visual acuity, blurriness, and difficulty with his peripheral vision, but examinations generally noted 20/20 acuity in his right eye and he was noted to have significant improvement with treatment. During some of the earlier records, the claimant reported a decrease in his near and distance visual acuity in the right eye in May 2014 (Ex. B1F/2). He complained of mild blurriness in the right eye in 2015, with vision coming and going and floaters (Ex. B4F/29). He presented with no new complaints in his right eye as well as clear vision and intact visual function in July 2016 (Ex. B4F/2). In February 2017, the claimant indicated he felt his visual acuity was unchanged and he noted an occasional dull throbbing discomfort lasting for seconds, then dissipating, in his right eye (Ex. B9F/1). More recently, he was noted to continue to show improvement in his right eye, respond extremely well to Eylea, and he was maintaining functional vision in his right eye in August 2017 (Ex. B11F/8).

As noted above, the examinations and testing results throughout the record generally show 20/20 visual acuity in the right eye, as well some restricted visual field, and macular edema which improved over time. For example, during testing in May 2014, the claimant had 20/20 corrected 20/20 vision in the right eye, and his left eye was no light perception (Ex. B1F/3). In December 2014, the claimant's vitreous in the right eye was noted to be clear status/post vitrectomy (Ex. B4F/36). He had recurrent macular edema and 4+ panretinal photocoagulation in the periphery. Persistent macular edema of the right eye was noted in July 2016, though it was adequately controlled (Ex. B4F/2). His visual acuity remained 20/20 in the right eye. A visual field test interpretation in February 2017

3

showed decreased vision, reliable, superior and inferior arcuate defects, goes out to 20 degrees inferiorly but restricted to 10 degrees temporal, nasal, and superior (Ex. B9F/2-4). His visual field was noted to be 24-2. It should also be noted that the analysis showed low test reliability. His diabetic macular edema was noted to have improved markedly in February 2017 (Ex. B11F/20).

In addition to the vitrectomies noted above, the claimant later had PRP laser treatment in April 2014 (Ex. B11F/1). He was noted to show a significant improvement on Eylea injection treatment in January 2016 (Ex. B4F/ 12). The claimant was noted to be responding very well to Eylea and able to gradually extend his treatment in July 2016 (Ex. B4F/2).

As for the alleged problems with diabetes and diabetic neuropathy, there is simply little indication of any exertional limitations due to these conditions. Indeed, the claimant's diabetes was noted to be stable in April 2015 and he was compliant with his medication at that time (Ex. B2F/2). Steady improvement was noted in his diabetic condition in March 2017 (Ex. B12F /3). He also reported neuropathy in feet in February 2015 (Ex. B4F/29). Complaints of worsening neuropathy in 2016, which [Houseman] attributed to an elevated AlC (Ex. B3F /4). He denied true numbness in the distal extremities or obvious loss of sensation, but noted some sensation of paresthesia in the lower extremities (Ex. B5F/2). Moreover, the physical examinations throughout the record were largely unremarkable. See for example, the examination in September 2016 (Ex. B5F/3). In September 2017, the claimant's A1C meet his goal and was under good control (Ex. B12F/38). Physical examinations with respect to strength, gait, and nerves were within normal limits during 2017 and 2018 (Ex. B12F). During the consultative examination with Dr. Ickes, the claimant's posture, gait, and other psychomotor activities were normal (Ex. B6F). Overall, the record does not support exertional limitations due to his diabetic condition, but his diabetes and neuropathy has been considered in the postural and environmental limitations set out above…

(ECF No. 9 at 128-30).

## 2.    Marsh's Narrative of Houseman's 2016 Treatment Notes

Because Marsh argues that the ALJ "minimized, if not ignored, evidence [that] document[ed] Mr. Marsh's peripheral neuropathy" from Houseman (ECF No. 11 at 13), the Court includes Marsh's supplemental narrative of the 2016 Houseman treatment notes that were before

the ALJ:

> Mr. Marsh presented to Kevin Houseman, D.P.M., in January 2016 for foot care associated with his diabetes mellitus (Tr. 469). Dr. Houseman found very weak distal pulses bilaterally and absent sensation in the distal digits with light touch (*Id.*). There was contraction of the toes on Mr. Marsh's left foot which produced some pain which surprised the doctor given the amount of neuropathy present (*Id.*). Dr. Houseman's diagnoses included diabetes mellitus with peripheral neuropathy and he wrote Mr. Marsh a prescription for new diabetic shoes (Tr. 469, 472). At the next examination, on April 12, 2016, the doctor again found absent sensation to light touch at the digits bilaterally, 1/4 dorsalis pedis pulses bilaterally, weak posteriortibial pulses bilaterally and some nonpitting edema in the feet bilaterally (Tr. 470). In July 2016, Mr. Marsh reported worsening neuropathy which Dr. Houseman attributed to increased A1C (Tr. 471). The doctor's examination findings were similar though he noted the presence of edema in the both ankles (*Id.*).

(ECF No. 11 at 5; *see* ECF No. 9 at 473-75).

### C. Relevant Opinion Evidence

> As for the opinion evidence, the reviewing physician opinions with the State Agency Division of Disability Determinations (DDD) are given some weight (Ex. B5A, B6A, B9A, and Bl0A). The state agency physical consultants at both the initial and reconsideration levels opined that the claimant could perform a full range of work at all exertional levels, but due to vision problems the claimant is precluded from climbing ladders, ropes, and scaffolds; must avoid hazards such as unprotected heights, dangerous machinery, and commercial driving, and can read large print only. He cannot perform work requiring full depth perception or bright lights. This RFC was an adoption of the RFC from the prior ALJ decision dated November 26, 2014. These opinions are supported by the much of the objective medical evidence in the record in which the claimant's gait is generally noted to be intact and no significant deficits to strength or range of motion are noted. Moreover, state agency medical consultants are highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act. However, the undersigned has added more significant visual limitations in the RFC above based upon the testimony of Dr. Horwitz at the hearing and the claimant's detailed testimony of his visual issues…

Great weight has been given to the opinion of medical expert, Dr. Horwitz (Hearing Testimony). Dr. Horwitz is a specialist in ophthalmology, and his opinion related directly to his specialty. The entirety of the record, including the most recent documentation, was available when Dr. Horwitz made his opinion. He opined that the claimant has diabetic retinopathy in both eyes and a history of vitrectomy surgery in each eye. His left eye was low/no light perception, but Dr. Horwitz opined that the claimant has done 'quite well' in the right eye. He noted that the lens in his right eye was called 'clear' in August 2018 (Ex. 11F/3). Dr. Horwitz noted that the injections in his right eye to reduced swelling and helped keep the vision stable. He has also had laser treatment to treat his condition. Dr. Horwitz noted that the claimant generally has 20/20 vision in his right eye. Notably, Dr. Horwitz opined that no visual listing has been met. Functionally, he opined that the claimant would have monocular vision and that he should not work around unprotected heights or moving machinery, not climb ladders, ropes, or scaffolds, not do commercial driving, and his ability to sort small objects would be limited. Additionally, Dr. Howitz opined that the claimant should be able to see small print and a computer screen with the right eye and should be able to maneuver around his environment, although possibly at a slower pace than a person with vision in both eyes. The undersigned finds the opinions of the medical expert to be the most informed, consistent with the medical evidence of record, and consistent with the record as a whole, and has thus given them great weight in forming the RFC above (20 CFR 404.1527 and 416.927)…

(ECF No. 9 at 130-31).

## IV.    Post-Decision Evidence

Marsh asks the Court to consider three sources of post-decision evidence: (1) treatment records from treating podiatrists Houseman and Rebecca Inwood, D.P.M., dating from October 23, 2016, to May 19, 2020; (2) hospital records from June 27, 2019 to June 30, 2019, detailing acute kidney failure, lower-leg pain, and lower-leg edema; and (3) treatment records from treating ophthalmologist Krysta Goslin, M.D., from a May 24, 2019 appointment. (ECF No. 11 at 15).

### A.     Houseman's and Inwood's 2016-20 Treatment Notes

As an exhibit to his merits brief here, Marsh submitted 21 pages of treatment notes from Houseman and 6 pages of treatment notes from Inwood. (ECF No. 11-2). They concern Marsh's peripheral neuropathy, diabetic nail care, and hammertoes. (ECF No. 11-2). The physicians note that Marsh lacks sensation distally and proximally, as tested by Semmes-Weinstein filament. (*E.g.* ECF No. 11-2 at 2, 3, 5, 7, 10, 13, 14, 16, 18, 20). They note that Marsh feels "no pain with palpitation … as he is profoundly neuropathic distally." (*E.g.* ECF No. 11-2 at 14, 16, 18, 20, 22). They note that Marsh has very long and thick toenails. (*E.g.* ECF No. 11-2 at 3, 5, 7, 10, 14, 16, 18). On many occasions, they note that Marsh's toenails are his only complaint. (*E.g.* ECF No. 11-2 at 2, 3, 10, 12, 14, 16). And they note that Marsh never presents with open wounds. (ECF No. 11-2).

Houseman also notes that Marsh has mild edema. (*E.g.* ECF No. 11-2 at 1, 2, 3, 5, 18). On one occasion, Houseman notes that Marsh has experienced "pain about his right foot" and that Marsh has "noticed some swelling. [It has] … been present for a few weeks on and off. I[t] does not cause significant discomfort but it is aggravating. He denies calf pain, chest pain, [and] shortness of breath." (ECF No. 11-2 at 18).

### B.     Marsh's 2019 Hospitalization Records

Marsh submitted evidence to the Appeals Council that he was hospitalized on March 5, 2019, "for worsening acute kidney injury, hyperkalemia, and peripheral edema." (ECF No. 9 at 73). Marsh was described as "alert and oriented," in "no acute distress," and as "obese with no tachypnea." (ECF No. 9 at 73). His cardiovascular system was normal with no edema. (ECF No. 9 at 73). Marsh's doctors gave him supplemental intravenous fluids and insulin. (ECF No. 9 at 73). They performed an ultrasound of his lower extremity and did not find "any evidence of [deep vein

thrombosis].” (ECF No. 9 at 73). They also “talked [to him] at length about the importance of complete tobacco cessation” and managing his weight. (ECF No. 9 at 74). Marsh was discharged on March 8, 2019, as clinical stable. (ECF No. 9 at 73-74).

Marsh also submitted evidence to the Appeals Council that he was hospitalized on June 28, 2019. (ECF No. 9 at 67-70). His admitting diagnoses were “lower leg pain—swelling” and “edema—leg.” (ECF No. 9 at 68). He was described as generally “alert and oriented” and in “no acute distress.” (ECF No. 9 at 69). His cardiovascular system was performing at a normal rate with a normal rhythm; he had no murmurs or peripheral perfusions; and “trace pretibial and ankle edema.” (ECF No. 9 at 69). Marsh’s doctors noted that he “presented to the emergency room because of elevated blood pressure and right leg subjective swelling.” (ECF No. 9 at 70). His blood pressure at admittance was 162/83, his pulse 79 beats per minute, and “respiratory rate 20 saturating 100% on room air.” (ECF No. 9 at 70). The doctors admitted him to treat “acute on [*sic.*] chronic kidney injury with a metabolic acidosis in the setting of chronic anemia, peripheral edema, DM 2, hypertension, morbid obesity, obstructive sleep apnea on CPAP and tobacco abuse.” (ECF No. 9 at 70). Marsh’s doctors performed a CT scan on his abdomen and pelvis, and the findings were “nonacute.” (ECF No. 9 at 70). Nephrologists “believed that [Marsh’s] renal failure started as pre-renal and then became intrinsic.” (ECF No. 9 at 70). They also “opined that his diabetic nephropathy was likely progressing.” (ECF No. 9 at 70). Marsh’s discharge diagnoses were “acute kidney failure, unspecified”; “proteinuria, unspecified”; and “acidosis.” (ECF No. 9 at 68).

### C. Goslin’s May 2019 Visual-Field-Exam Report

Marsh submitted evidence to the Appeals Council that his primary care physician, Jerome Schartman, M.D., referred Marsh to Krysta Goslin, M.D., for a vision-field exam, which Goslin conducted on May 24, 2019. (ECF No. 9 at 95-98). According to Goslin, Marsh reported that he

had lost his driver's license and that he was experiencing "'achy pain' that comes and goes," decreased vision, and occasional floaters. (ECF No. 9 at 95). The report notes that Marsh's symptoms began about one month before the visit. (ECF No. 9 at 95). After examining Marsh, Goslin concluded that Marsh had a "superior and inferior arcuate defect, small central area of vision, possible slight progression from[]previous [exam results] inferiorily[,] otherwise pretty stable, cont[inue] to monitor" the condition. (ECF No. 9 at 96).

## V.     The ALJ's Decision

As is relevant and helpful here, the ALJ issued the following findings of fact and narrative analysis:

> 3. The claimant has the following severe impairments: diabetes mellitus; diabetic retinopathy status post vitrectomies; major depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)). The above medically determinable impairments significantly limited the ability to perform basic work activities as required by SSR 85-28…
>
> [T]he record otherwise documents only conservative treatment for relatively minor, resolved, nonrecurring, or controlled complaints and conditions, including diabetic neuropathy, sleep apnea, cataracts, hypertension, obesity, and hammertoes of the left foot (Ex. B2F, B3F, and B12F). He alleged having some numbness in his feet and toes due to his diabetes, but indicated that he does not treat these symptoms with any medication. His hypertension was regularly noted to be stable (Ex. B2F/12). The claimant was measured at 5' 10" tall and 277 pounds with a BMI of 39.87 in March 2018, but there is no indication in the examination findings that his obesity, neuropathy, or hammertoes limited his exertional capacity (Ex. B12F/18)…
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1…
>
> The claimant's impairments failed to meet the any of the special senses listings for vision set out at 2.00. Specifically, the record, consistent with the findings below, does not demonstrate remaining vision in the better eye after best correction is 20/200 or less as

required by listing 2.02 (Loss of Central Visual Acuity). Dr. Horwitz, the medical expert, testified that the claimant's visual functional capacity far exceeded the requirements of 2.03 (Contraction of the visual field in the better eye). There is no indication in the record that the widest diameter subtending an angle around the point of fixation no greater than 20 degrees; an MD of 22 decibels or greater, determined by automated static threshold perimetry that measures the central 30 degrees of the visual field; or a visual field efficiency of 20 percent or less, determined by kinetic perimetry. Dr. Horwitz also testified that listing 2.04 (Loss of visual efficiency, or visual impairment, in the better eye) had not been met, given his review of the entirety of the evidence. Indeed, the record, as detailed below, did not reveal a visual efficiency percentage of 20 or less after best correction or a visual impairment value of 1.00 or greater after best correction.

With the revision of Appendix A of the Regulations (the Listings of Impairments) in 76 Federal Register, No. 68, pp. 19697, -98, April 8, 2011, there is no longer a specific listing for diabetes mellitus. Listing 9.00B5(a)(ii) states that diabetic peripheral and sensory neuropathy will be evaluated under listing 11.00 for neurological impairments. As per that listing, the claimant does not have peripheral neuropathy characterized by disorganization of motor function in two extremities (see 11.00Dl), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. Nor does the claimant have marked limitation … in physical functioning…

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance; and occasionally manipulate small items such as screws, nuts and bolts. He must avoid workplace hazards such as unprotected heights and machinery. He can do no commercial driving. He can occasionally read of small print (newsprint or smaller) and occasionally use computer monitors. He is limited to work in environments with lighting conditions consistent with the typical office environment. Mentally, he is limited to no strict production quotas or fast-paced work such as on an assembly line…

6. The claimant is unable to perform any past relevant work…

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills…

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform…

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2012, through the date of this decision.

(ECF No. 9 at 125-33).

## VI. Law & Analysis

### A.    Standard of Review

A district court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a district court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the district court must affirm the Commissioner's findings, even if the district court does not agree with the Commissioner's decision or substantial evidence

11

exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without a district court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—*i.e.*, "fails to follow its own regulations"—unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). An error causes harm if it "prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* A district court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit district courts follow *Sarchet*'s logical-bridge requirement[1] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance

---

[1] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Discussion

Marsh raises two distinct issues. First, Marsh asserts that the ALJ failed to include in Marsh's RFC critical physical limitations that stem from Marsh's peripheral neuropathy (a symptom of his diabetes mellitus). (ECF No. 11-14). Marsh argues that the ALJ parsed the medical record and "did not satisfy his chief responsibility of considering all of the evidence in the record." (ECF No. 11 at 13). The Commissioner disagrees, arguing that the ALJ "considered all symptoms … and … properly discounted Marsh's subjective complaints" of standing and walking limitations associated with peripheral neuropathy. (ECF No. 13 at 5-6). The Commissioner also notes that the ALJ concluded that Marsh's "symptoms were 'not entirely consistent with the medical evidence and other evidence in the record.'" (ECF No. 13 at 5-6).

Second, Marsh asks the Court to remand his claim to the State Agency for additional consideration of three sources of evidence that were not before the ALJ. (ECF No. 11 at 14-17). Marsh has submitted: (1) treatment records from treating podiatrists Houseman and Inwood that dated from October 23, 2016, to May 19, 2020; (2) hospital records from March 5, 2019, to March

8, 2019, and June 27, 2019, to June 30, 2019, that detail acute kidney failure, lower-leg pain, and lower-leg edema; and (3) treatment records from treating ophthalmologist Krysta Goslin, M.D., from a May 24, 2019 appointment. (ECF No. 11 at 15). The Commissioner does not agree that these pieces of evidence are new and material or that good cause exists for Marsh failing to produce the evidence to the ALJ. (ECF No. 13 at 8-12).

For the reasons discussed below, the Court agrees with the Commissioner in both instances.

### 1.      Marsh's Peripheral Neuropathy and RFC

Marsh asserts that the ALJ should have included in Marsh's RFC certain limitations stemming from his peripheral neuropathy that relate to Marsh's abilities to stand and walk. (ECF No. 11 at 11-12). Marsh acknowledges that the ALJ discussed Marsh's peripheral neuropathy in his decision, but Marsh objects to the ALJ referencing Houseman's treatment notes on the matter with only one sentence. (ECF No. 11 at 13). That sentence states that Marsh "[c]omplain[ed] of worsening neuropathy in 2016, which [Houseman] … attributed to an elevated AlC." (ECF No. 9 at 129). Because the ALJ did not emphasize Houseman's treatment notes in his RFC narrative, Marsh asserts that "the ALJ … minimized, if not ignored, evidence documenting Mr. Marsh's peripheral neuropathy from Dr. Houseman." (ECF No. 11 at 13). Marsh notes that "Dr. Houseman, in three separate examinations, documented very weak pulses and absent sensation in the distal digits bilaterally… Edema was also present bilaterally in his ankles and feet in April and July 2016…" (ECF No. 11 at 13 (citing to ECF No. 9 at 473-75)).

On substantial-evidence review, the Court can review only that which was before the ALJ, as "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Phillips v. Comm'r of Soc. Sec.*, No. 5:19-cv-1261, 2020 WL 1159376, at *10 (N.D. Ohio Mar. 10, 2020) (quoting *Foster v. Halter*,

279 F.3d 348, 357 (6th Cir. 2001)). Marsh submitted the hospitalization records first to the Appeals council. (ECF No. 9 at 67-70, 95-98). Marsh submitted the additional Houseman treatment notes first here (as an exhibit to his merits brief). (ECF No. 11-2). Thus, both evidentiary sources fall outside of the administrative record; the Court cannot consider them in reviewing the ALJ's determination (even though they pertain to Marsh's lower-extremity functional limitations as discussed below).

During the sequential evaluation process, an ALJ must identify the claimant's RFC, which "is the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC denotes "functional limitations and restrictions and … [the claimant's] remaining capacities for work-related activities." Soc. Sec. Ruling 96-08p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ must "assess[] 'an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.'" *Stewart v. Comm'r of Soc. Sec.*, 881 F. App'x 349, 355 (6th Cir. 2020) (quoting SSR 96-8p, at *1). The ALJ must "consider [the claimant's] ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(b)(4); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). But in fashioning a claimant's RFC from the medical evidence in the record, an ALJ cannot selectively parse or cherry-pick various medical reports or facts to suit a pre-determined outcome. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014); *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011).

After reviewing the ALJ's RFC narrative as a whole, the Court is satisfied that the ALJ fully and fairly considered Marsh's peripheral neuropathy in fashioning Marsh's RFC. The ALJ noted that Marsh had been diagnosed with peripheral neuropathy and that Marsh reported that his peripheral neuropathy was getting worse in 2016. (ECF No. 9 at 129 (citing ECF No. 9 at 475,

508)). The ALJ also noted that while Marsh "denied true numbness in the distal extremities or obvious loss of sensation, … [he] noted some sensation of paresthesia in the lower extremities" in a 2016 treatment note from John Hanna, M.D. (Marsh's family physician). (ECF No. 9 at 129 (citing ECF No. 9 at 517-18)). Yet, the ALJ also explained that the record's other evidence did not compel standing or walking limitations stemming from Marsh's peripheral neuropathy. For example, Marsh's "physical examinations throughout the record were largely unremarkable." (ECF No. 9 at 129 (citing ECF No. 9 at 517-18)). Marsh's "[p]hysical examinations with respect to strength, gait, and nerves were within normal limits during 2017 and 2018." (ECF No. 9 at 129 (citing generally Ex. B12F (*see* ECF No. 9 at 593, 596, 598, 600, 604, 607))). And "[d]uring the consultative examination with Dr. Ickes, … [Marsh's] posture, gait, and other psychomotor activities were normal." (ECF No. 9 at 129 (citing ECF No. 9 at 531)). Together, the record as a whole supports the ALJ's finding that "there is … little indication … [that Marsh's peripheral neuropathy causes him] any exertional limitations." (ECF No. 9 at 129). The evidence is substantial because a reasonable person might accept it as adequate support for the ALJ's peripheral neuropathy finding. *Rogers*, 486 F.3d at 241. And it is a logical bridge between Marsh's diagnoses, observers' notes that the condition generally does not cause Marsh to experience exertional limitations, and the ultimate RFC finding. *Fleischer*, 774 F. Supp. 2d 877. Thus, the ALJ's RFC finding is supported by substantial evidence.

Concerning Marsh's contention that the ALJ parsed Houseman's treatment notes, Marsh is correct that Houseman also "documented very weak pulses and absent sensation in [Marsh's] distal digits bilaterally" as well as ankle and foot edema in his treatment notes. (ECF No. 11 at 13 (citing ECF No. 9 at 473-75)). But Marsh bears the burden of explaining what additional exertional limitations those symptoms would compel and how they outweigh the other objective evidence in

the record that supports a finding that Marsh's peripheral neuropathy does not cause any exertional limitations. *See Jones*, 336 F.3d at 474 ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). He has not done so. Moreover, while the ALJ could have meticulously reported these additional facts in his narrative, he does not need to do so: "[I]t is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006). As discussed above, it is sufficiently clear that the ALJ considered the full record in fashioning Marsh's RFC. Thus, the Court concludes that the ALJ did not parse the record.

The Commissioner's factual findings are conclusive and must be respected when they are supported by substantial evidence and logically drawn from the record—even if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo*." (quotation omitted)). Thus, the Court should not disturb the ALJ's RFC finding.

### 2.     Marsh's Sentence-Six Remand Request

Additionally, Marsh asks the Court to remand his claim to the State Agency so that the State Agency can consider further his case in light of additional evidence. (ECF No. 11 at 14). This is known as a sentence-six remand under 42 U.S.C. § 405(g). In support, Marsh submits three sources of evidence: (1) treatment records from treating podiatrists Houseman and Inwood, dating from October 23, 2016 to May 19, 2020; (2) hospital records from March 5, 2019, to March 8,

2019, and June 27, 2019, to June 30, 2019, that detail acute kidney failure, lower-leg pain, and lower-leg edema; and (3) treatment records from treating ophthalmologist Krysta Goslin, M.D., from a May 24, 2019 appointment. (ECF No. 11 at 15). The Court addresses each evidentiary source separately.

### a.  Sentence Six Framework

Sentence six of 42 U.S.C. § 405(g) is an alternative ground on which to remand a case. It states that "the court may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding…" 42 U.S.C. § 405(g). The Sixth Circuit has drawn from that statute two elements: "(i) that the evidence at issue is both 'new' and 'material,' and (ii) that there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006); *see also Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). But the first element contains two independent sub-elements—the timeliness and the nature of the evidence submitted. *E.g.*, *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Thus, and primarily for illustrative purposes, the Court here analyzes Marsh's sentence-six remand request under a three-element framework:

> [(1)] that the evidence be 'new'—that is, 'not in existence or available to the claimant at the time of the administrative proceeding'; [(2)] that the evidence be 'material,' which requires showing a 'reasonable probability' that the Commissioner would have reached a different disposition of the claim if presented with the new evidence; and [(3)] that 'good cause' exists for not producing the evidence in a prior proceeding, which requires showing 'a reasonable justification for the failure to acquire and present the evidence of inclusion in the hearing before the ALJ.'

*Phillips*, 2020 WL 1159376, at *10 (quoting *Foster*, 279 F.3d at 357). Movants must demonstrate

that their sentence-six remand request satisfies each of the above elements. *Hollon*, 447 F.3d at 483.

If a district court remands a claim under sentence six, then the district court "does not affirm, reverse, or modify the Commissioners decision." *Prater v. Comm'r of Soc. Sec.*, 235 F. Supp. 3d 876, 880 (6th Cir. 2017) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991)). And jurisdiction in such instances would rest with the district court, *i.e.*, a sentence-six remand "is not a final judgment that can be appealed." *Id.*

### b. Houseman's and Inwood's 2016-20 Treatment Notes

Houseman's and Inwood's supplemental treatment notes, which Marsh submitted for the first time here (ECF No. 11-2), do not warrant remand. These treatment notes discuss Marsh's peripheral neuropathy and resulting sensory deficiencies, hammertoes, and toenail treatments. (ECF No. 11-2).

Marsh contends that these treatment notes are new because they were "not made available at the time of the hearing." (ECF No. 11 at 15). Marsh asserts that the ALJ should have unilaterally obtained these records "to satisfy his duty to fully develop the record." (ECF No. 11 at 15). That argument is unpersuasive for two reasons. First, most of the treatment notes existed before the ALJ's decision, and Marsh's argument does not address why the evidence was "[un]available to [Marsh or the ALJ] at the time of the administrative proceeding," which he must do. *Phillips*, 2020 WL 1159376, at *10. Instead, Marsh asserts that the ALJ failed to acquire these records, which arguably addresses the good cause element, as it attempts to provide "a reasonable justification for the failure to acquire and present the evidence" to the ALJ. *Id.* Because Marsh never explains why the records are new, he fails to demonstrate this critical element.

Second, even if analyzed under the good cause element, Marsh's argument ignores his duty

to prove that he is disabled. A claimant must "inform [the Commissioner] about or submit all evidence known to [the claimant] that relates to whether or not [the claimant is] blind or disabled…" 20 C.F.R. § 404.1512(a)(1); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."). The Commissioner requested Houseman's records in 2016. (*See* ECF No. 9 at 472). Although the Commissioner must make "every reasonable effort"[2] to fully develop the claimant's "complete medical history,"[3] Marsh alone knew that he continued to visit Houseman after 2016—and that Houseman's records might be relevant to his claim's disposition. Despite knowing this, Marsh's counsel did not object to the ALJ entering the exhibits into the record in 2018 without Houseman's treatment notes (ECF No. 9 at 141-42), and Marsh did not submit them to the Appeals Council, either. Moreover, Marsh does not explain in his brief how the ALJ failed to develop the record, and his footnote does not apply the cited case law to the facts present in this case. (*See* ECF No. 11 at 15, n. 12). Accordingly, Marsh failed his burden.

Marsh has failed to demonstrate that these records are new and that good cause exists to justify his failure to acquire and present the evidence to the ALJ. (The Court does not analyze whether the records are material because the other two elements for a sentence six remand are not

---

[2] "Every reasonable effort means that we will make an initial request for evidence from your medical source or entity that maintains your medical source's evidence, and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination…" 20 C.F.R. § 404.1512(b)(i).

[3] "Complete medical history means the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application. If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier…" 20 C.F.R. § 404.1512(b)(ii).

present.) Accordingly, the Court should not remand the claim under sentence six remand for further consideration of this evidence.

### c.     Marsh's March and June 2019 Hospitalization Records

The hospitalization records that Marsh submitted do not warrant remand, either, as they concern acute events that occurred after the ALJ issued his decision. Marsh's March and June 2019 hospitalizations records explain that Marsh was hospitalized for worsening acute kidney injury, hyperkalemia, and peripheral edema. (ECF No. 9 at 69, 73). As a preliminary point, these records—which postdate the ALJ's decision—are necessarily new, *i.e.*, they were "not in existence or available to the claimant at the time of the administrative proceeding." *Prater*, 235 F.Supp.3d at 880. Similarly, Marsh has satisfied the good cause element because it was impossible to present the records to the ALJ before he issued his decision, as they concern acute treatment events that postdated the decision. The parties appear to agree on these points.

But the parties disagree about whether the hospitalizations records are material. Marsh argues that they are material because they "directly relate to Mr. Marsh's lower extremity limitations imposed by peripheral edema associated with diabetes mellitus," which purportedly relates back to Marsh's limitations before the ALJ issued his decision. (ECF No. 11 at 16). The Commissioner, though, argues that the records show only a worsening condition because they discuss "*acute* kidney failure, which is known to develop rapidly and commonly results in swelling of the lower extremities." (ECF No. 13 at 11 (emphasis in original)).

The Court concludes that the records are not material for two reasons. First, when viewed in the broadest light, Marsh's hospitalizations for acute kidney injury demonstrate a worsening condition of his diabetes-related kidney damage. (ECF No. 9 at 70). But "[e]vidence that merely shows that the claimant's condition has become aggravated or deteriorated since the

21

Commissioner's decision will not satisfy the burden because 'such evidence does not demonstrate the point in time that the disability itself began.'" *Wilkins v. Comm'r of Soc. Sec.*, No. 1:13-cv-638, 2014 WL 1894447, at *2 (N.D. Ohio May 12, 2014) (quoting *Sizemore*, 865 F.2d at 712). Second, concerning Marsh's peripheral edema, the March 2019 record notes that there was "no edema" in Marsh's cardiovascular assessment and the June 2019 record described Marsh's edema as only "trace … ankle edema." (ECF No. 9 at 69, 73). Thus, it is not reasonably probable that the ALJ would have reached a different disposition of the claim—or even his assessment of Marsh's edema—if presented with the new records because findings of *no edema* and *trace ankle edema* are unlikely to change the Commissioner's assessment of Marsh's diabetic neuropathy, which he concluded did not affect Marsh's postural ability to work. (ECF No. 9 at 129).

Although the records relate to Marsh's lower extremity limitations, they are not material to his claim's disposition. Accordingly, the Court should not remand the claim under sentence six.

### d. Goslin's May 2019 Visual-Field-Exam Report

Goslin's May 2019 visual-field-exam report discussed a "superior and inferior arcuate defect, small central area of vision, possible slight progression from[]previous [exam results] inferiorily[,] otherwise pretty stable, cont[inue] to monitor" the condition. (ECF No. 9 at 96). Like the March and June hospitalization records, this report was authored after the ALJ issued his decision, so it too is new. And because Marsh apparently visited Goslin to discuss symptoms that had arisen in April 2019 (ECF No. 9 at 95), Marsh arguably has a reasonable justification—good cause—for failing to acquire and present the record to the ALJ for his consideration.[4]

---

[4] It is unclear whether Marsh visited Goslin because of new vision concerns or to augment his case record with additional evidence. The Court's confusion stems from Horwitz's testimony at the hearing, during which he implied that Marsh could meet an Appendix Listing disability if a more current vision-field-exam report demonstrated that his vision had deteriorated. (ECF No. 9 at 148). Thus, Marsh may have sought a visual-field-exam report that could demonstrate such a

But the parties again disagree about the record's materiality. Marsh argues that it is material for two reasons: (1) "[Horwitz] testified that more current visual field testing would have been helpful to determine the progression of his peripheral vision loss," which Marsh believes this record provides; and (2) the record "documents a worsening visual field defect of Mr. Marsh's right eye just a short time after the ALJ's resolution of the claim…" (ECF No. 11 at 16). The Commissioner, though, asserts that it is not material because a "'possible slight progression from[]previous'" exam findings does not make it reasonably probable "that the ALJ would have reached a different decision if presented with the report." (ECF No. 13 at 12 (quoting ECF No. 9 at 95-96)). Moreover, the Commissioner notes that Marsh's vision is reported as "'otherwise pretty stable.'" (ECF No. 13 at 12 (quoting No. 9 at 95-96)).

The Court agrees with the Commissioner. As with Marsh's hospitalization records, this evidence shows only worsening or deteriorating of Marsh's visual condition, which does not require a sentence six remand because "such evidence does not demonstrate the point in time that the disability itself began." *Wilkins*, 2014 WL 1894447, at *2. Marsh is correct that Horwitz would have considered an updated visual-field-exam report before opining on Marsh's visual impairment as of the hearing. (*See* ECF No. 9 at 148 ("If [Marsh] had a more current visual field done, it's possible [that it might show that Marsh's visual impairment had progressed], because sometimes the visual field loss from laser progresses… [B]ut probably not to the point that it would meet or equal a listing...")). But it does not follow that any visual-field-exam report would require or compel additional consideration by the State Agency. Goslin's report, after all, shows only a

---

progression. But the Commissioner does not assert that this occurred, and, instead, "assumes for the purpose of the argument" that Goslin's report "is probative of Marsh's condition during the period considered by the ALJ…" (ECF No. 13 at 12). Accordingly, the Court too assumes that the report relates to Marsh's visual limitations for the relevant period and that good cause exists for its earlier absence.

"possible slight progression" in Marsh's vision impairment. Thus, it is not reasonably probable that Goslin's report would alter the ALJ's decision on Marsh's vision limitations.

Because Marsh fails to demonstrate that Goslin's report is material, the Court should not remand the claim under sentence six remand for further consideration of this evidence.

*         *         *

Marsh fails to persuade the Court that any of the above-analyzed evidence compels a sentence six remand. 42 U.S.C. § 405(g). Accordingly, the Court does not recommend that the Court remand the case for additional consideration of any of the additional evidence.

## VII.  Recommendation

The ALJ followed proper procedures and his decision is supported by substantial evidence. Thus, I recommend that the Commissioner's final decision denying Marsh's application for disability insurance benefits and supplemental security income be AFFIRMED.

DATED: 1/11/2021

  s/*Carmen E. Henderson*         
Carmen E. Henderson
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).